UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
No: 1:20-CV-00146

| | |
|---|---|
| JASON BLACKWELL, as ADMINISTRATOR for the ESTATE of JOSHUA SHANE LONG,<br><br>     Plaintiff,<br><br>  v.<br><br>DERRICK PALMER, SHERIFF of CHEROKEE COUNTY, individual and official capacity; MARK THIGPEN, CHIEF DEPUTY CCSD, individual and official capacity; MARK PATTERSON, CAPTAIN, Chief Jailer CCSD, individual and official capacity; JEREMY BRESCH, LIEUTENANT, Jail Supervisor CCSD, individual and official capacity; FRANK DALY, SERGEANT, Jail Supervisor CCSD, individual and official capacity; LARRY BOLEN, Detention Officer CCSD, individual and official capacity; GLENN HOLLOWAY, Detention Officer CCSD, individual and official capacity; TIFFANY ENLOE, Detention Officer CCSD, individual and official capacity; MICHAEL FAGGARD, Deputy CCSD, individual and official capacity; PATRICK WILLIAMS, SERGEANT, CCSD, individual and official capacity; CHEROKEE COUNTY SHERIFF'S DEPARTMENT; CHEROKEE COUNTY; and OHIO CASUALTY INSURANCE CO., OHIO CASUALTY CORP., and LIBERTY MUTUAL INSURANCE CO., as SURETY,<br><br>     Defendants. | **COMPLAINT**<br>(Jury Trial Demanded) |

Jason Blackwell, Administrator of the Estate of Joshua Long, alleges as follows:

## STATEMENT OF THE CASE

   Sheriff Palmer has a safety policy. Failing to follow it puts the lives of inmates in his custody at the Jail in danger. His safety policy requires that an at-risk inmate must receive medical evaluation before being confined. His employees and sworn officers who work for him either did not know, or flagrantly failed to follow, his safety policy.

When deputies arrested Joshua Long on July 11, 2018, they knew he swallowed some unknown substance and was acting erratically. The Magistrate thought that Mr. Long was so intoxicated that he issued a secured bond to keep Mr. Long in Jail until someone could pick him up. The detention officers who booked Mr. Long into the Jail around 7 p.m. knew that he swallowed some unknown substance and was acting erratically. They should have followed the Sheriff's safety policy and sent him to get medical evaluation. They never contacted Jail medical staff, EMS, or any medical provider at all until he died. Shockingly, they did not even perform basic medical screening or start a special watch for Mr. Long. Instead, they either had no knowledge of, or flagrantly violated, the safety policy. They ignored Mr. Long until he died in a cell just a few feet away from their booking desk.

The Sheriff and his supervisors failed to ensure that his employees and agents knew about, much less complied with, his safety policy. There is a long-standing practice and custom at the Jail and in the Sheriff's Department of violating the written safety policy in ways that shock the conscious. As a direct result of the failures, from the top down to the bottom of the Sheriff's organization, Mr. Long suffered and died an unnecessary death. This should not have happened. This would not have happened if they knew about, or simply followed, the easy-to-use safety policy.

## PARTIES

1.      Plaintiff Jason Blackwell is the Administrator of the Estate of Joshua Long.

2.      At all relevant times, Defendant Derrick Palmer was a resident of Cherokee County, North Carolina and was the elected Sheriff of Cherokee County pursuant to Article

VII, Section 2 of the North Carolina Constitution and N.C. Gen. Stat. § 162-1. Plaintiff

sues Sheriff Palmer in his individual capacity and official capacity. On July 11, 2018,

Sheriff Palmer was:

a. In control of the Jail;

b. The final decision-making authority over law enforcement policies and personnel who worked for the Sheriff's Department and in the Jail;

c. Directly responsible for the appointment, retention, supervision, training, and conduct of his officers, deputies, employees, and agents;

d. Acting in the course and scope of his official duties as Sheriff of Cherokee County and under color of state law;

e. Responsible for the care and custody of the Jail;

f. Responsible for the care and custody of inmates and detainees in the Jail, including Mr. Long;

g. The keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55, and he appointed and delegated to other keepers of the Jail; and

h. Vicariously liable for the actions of his agents, employees, officers, deputies, supervisors, managers, jailors, and anyone else who worked in the Jail.

3. At all relevant times, Defendant Chief Deputy Mark Thigpen was a resident

of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff

as the Chief Deputy with the Cherokee County Sheriff's Office. Plaintiff sues Chief Deputy

Thigpen in his individual capacity and official capacity as the Chief Deputy. On July 11,

2018, Chief Deputy Thigpen was:

a.  Charged with the supervision of all of the officers, deputies, employees, and agents who worked for the Sheriff's Department and in the Jail;

b.  The final decision-making authority over law enforcement policies and officers, deputies, employees, and agents at the Jail;

c.  Directly responsible for the appointment, retention, supervision, training, and conduct of his officers, deputies, employees, and agents at the Jail;

d.  Acting in the course and scope of his official duties as an employee of the Sheriff of Cherokee County and under color of state law;

e.  Responsible for the care and custody of inmates and detainees in the Jail, including Mr. Long;

f.  A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55; and

g.  An agent and employee of Sheriff Palmer.

4.  At all relevant times, Defendant Captain Mark Patterson was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as the Chief Jailer with the Cherokee County Sheriff's Office. Plaintiff sues Captain Patterson in his individual capacity and official capacity as the Chief Jailer. On July 11, 2018, Captain Patterson was:

a.  Charged with the supervision of all of the officers, deputies, employees, and agents who worked in the Jail;

b.  The final decision-making authority over law enforcement policies and officers, deputies, employees, and agents at the Jail;

c.  Directly responsible for the appointment, retention, supervision, training, and conduct of his officers, deputies, employees, and agents at the Jail;

      d.      Acting in the course and scope of his official duties as an employee of the Sheriff of Cherokee County and under color of state law;

      e.      Responsible for the care and custody of inmates and detainees in the Jail, including Mr. Long;

      f.      A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55; and

      g.      An agent and employee of Sheriff Palmer.

5.      At all relevant times, Defendant Lieutenant Jeremy Bresch was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a supervisor at the Jail with the Cherokee County Sheriff's Office. Plaintiff sues Lt. Bresch in his individual capacity and official capacity as the supervisor at the Jail. On July 11, 2018, Lt. Bresch was:

      a.      Charged with the supervision of all of the operational aspects of the Jail, including those of all of the officers, deputies, employees, and agents who worked in the Jail;

      b.      The final decision-making authority over law enforcement policies and officers, deputies, employees, and agents at the Jail;

      c.      Directly responsible for the appointment, retention, supervision, training, and conduct of her officers, deputies, employees, and agents at the Jail;

      d.      Acting in the course and scope of his official duties as an employee of the Sheriff of Cherokee County and under color of state law;

      e.      Responsible for the care and custody of inmates and detainees in the Jail, including Mr. Long;

      f.      A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55; and

      g.      An agent and employee of Sheriff Palmer.

6. At all relevant times, Defendant Sergeant Frank Daly was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff. Plaintiff sues Sgt. Daly in his individual capacity and in his official capacity as sergeant with the Cherokee County Sheriff's Department. On July 11, 2018, Sgt. Daly was:

    a. Charged with the supervision of certain officers, deputies, employees, and agents who worked in the Jail;

    b. Directly responsible for the supervision, training, and conduct of certain officers, deputies, employees, and agents at the Jail;

    c. Acting in the course and scope of his official duties as an employee of the Sheriff of Cherokee County and under color of state law;

    d. Responsible for the care and custody of inmates and detainees in the Jail, including Mr. Long;

    e. A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55; and

    f. An agent and employee of Sheriff Palmer.

7. At all relevant times, Defendant Larry Bolen was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a Detention Officer with the Cherokee County Sheriff's Office. Plaintiff sues Officer Bolen in his individual capacity and official capacity as a Jailer. On July 11, 2018, Officer Bolen was:

    a. Charged with the supervision of certain officers, deputies, employees, and agents in the Jail;

    b. Directly responsible for the supervision, training, and conduct of certain officers, deputies, employees, and agents at the Jail;

      c.      Acting in the course and scope of his official duties as an employee of the Sheriff of Cherokee County and under color of state law;

      d.      Responsible for the care and custody of inmates and detainees in the Jail, including Mr. Long;

      e.      A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55; and

      f.      An agent and employee of Sheriff Palmer.

8.      At all relevant times, Defendant Glenn Holloway was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a Detention Officer with the Cherokee County Sheriff's Office. Plaintiff sues Officer Holloway in his individual capacity and official capacity as a Jailer. On July 11, 2018, Officer Holloway was:

      a.      Charged with the supervision of certain officers, deputies, employees, and agents in the Jail;

      b.      Directly responsible for the supervision, training, and conduct of certain officers, deputies, employees, and agents at the Jail;

      c.      Acting in the course and scope of his official duties as an employee of the Sheriff of Cherokee County and under color of state law;

      d.      Responsible for the care and custody of inmates and detainees in the Jail, including Mr. Long;

      e.      A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55; and

      f.      An agent and employee of Sheriff Palmer.

9.      At all relevant times, Defendant Tiffany Enloe was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a Detention Officer with the Cherokee County Sheriff's Office. Plaintiff sues Officer Enloe

in her individual capacity and official capacity as a Jailer. On July 11, 2018, Officer Enloe was:

    a.    Charged with the supervision of certain officers, deputies, employees, and agents in the Jail;

    b.    Directly responsible for the supervision, training, and conduct of certain officers, deputies, employees, and agents at the Jail;

    c.    Acting in the course and scope of her official duties as an employee of the Sheriff of Cherokee County and under color of state law;

    d.    Responsible for the care and custody of inmates and detainees in the Jail, including Mr. Long;

    e.    A keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55; and

    f.    An agent and employee of Sheriff Palmer.

10.    At all relevant times, Defendant Sergeant Patrick Williams was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a sergeant with the Cherokee County Sheriff's Office. Plaintiff sues Sgt. Williams in his individual capacity and official capacity as a Sheriff's deputy. On July 11, 2018, Sgt. Williams was:

    a.    Charged with the supervision of certain officers, deputies, employees, and agents of the Sheriff;

    b.    Directly responsible for the supervision, training, and conduct of certain officers, deputies, employees, and agents of the Sheriff;

    c.    Acting in the course and scope of his official duties as an employee of the Sheriff of Cherokee County and under color of state law;

d.    Responsible for the care and custody of inmates and detainees in his custody that he transported to the Jail, including Mr. Long;

    e.    An agent and employee of Sheriff Palmer.

11.    At all relevant times, Defendant Michael Faggard was a resident of Cherokee County, North Carolina and was employed by Cherokee County or the Sheriff as a deputy with the Cherokee County Sheriff's Office. Plaintiff sues Deputy Faggard in his individual capacity and official capacity as a Sheriff's deputy. On July 11, 2018, Deputy Faggard was:

    a.    Acting in the course and scope of his official duties as an employee of the Sheriff of Cherokee County and under color of state law;

    b.    Responsible for the care and custody of inmates and detainees he arrested and transported to the Jail, including Mr. Long; and

    c.    An agent and employee of Sheriff Palmer.

12.    Defendant Cherokee County Sheriff's Department is a subdivision of Cherokee County, and is authorized by the North Carolina Constitution and organized under the laws of the State of North Carolina. The Sheriff of Cherokee County is the final policymaker for Cherokee County for all purposes relevant to this Complaint.

13.    Defendant Cherokee County is a governmental subdivision of the State of North Carolina, and is a municipal entity authorized by the North Carolina Constitution and organized under the laws of the State of North Carolina. The Sheriff of Cherokee County is the final policymaker for Cherokee County for all purposes relevant to this Complaint.

14.     At all relevant times, Ohio Casualty Insurance Company (the "Surety"), or its parent or subsequent successor company either Ohio Casualty Corporation or Liberty Mutual Insurance Company, was a corporation organized and existing under the laws of the State of Ohio or Massachusetts. The Surety provided a Bond that covered Sheriff Palmer as Sheriff of Cherokee County and his employees and agents for at least $10,000.00 as required by N.C. Gen. Stat. §§ 162-8 and 58-72-1, *et sequ.*

## WAIVER OF IMMUNITY

15.     The allegations in the Paragraphs above are incorporated by reference.

16.     At all relevant times, to the extent that any or all Defendants claim they are a municipal or government or county-owned, operated, or funded entity or an employee or agent of such entity, all such Defendants waived any potential governmental immunity or sovereign immunity defense for any of the acts or omissions alleged in this Complaint.

17.     All individual Defendants are specifically sued in their individual capacity and in their official capacity.

18.     At all relevant times, Cherokee County, Cherokee County Sheriff Department, Sheriff Palmer, and any and all agents, employees, officers, jailers, deputies, or other persons who worked for him as sworn law enforcement officers or certified detention officers at the Jail, waived any potential governmental immunity or sovereign immunity defense to the extent that they had any bonds or insurance or participated in any local governmental risk pool pursuant to N.C. Gen. Stat. §§ 153A-435 and 58-23 that might cover any acts or omissions alleged in this Complaint.

19.     The Surety furnished a bond or bonds pursuant to N.C. Gen. Stat. § 162-8 and additional bonds covering Sheriff Palmer, so the Surety is named as a Defendant to this action, pursuant to N.C. Gen. Stat. § 58-72-1, *et seq*.

20.     At all relevant times, Cherokee County, Cherokee County Sheriff Department, Sheriff Palmer, and any and all agents, employees, officers, jailers, deputies, or other persons who worked for him as sworn law enforcement officers or certified detention officers at the Jail, including all of the named Defendants, waived any potential governmental immunity or sovereign immunity defense that could have been raised to the Complaint by virtue of the Surety's bonds and liability insurance policies to the extent of such bonds or policies.

21.     At all relevant times, Sheriff Palmer, and any and all agents, employees, officers, jailers, deputies, or other persons who worked for him as sworn law enforcement officers or certified detention officers at the Jail, including all of the named Defendants, waived any potential qualified immunity defense. To the extent that Defendants have not expressly waived any qualified immunity defense, no such defense can apply given the overt negligent and grossly negligent violations of Mr. Long's constitutionally protected rights while he was in the custody and control of Sheriff Palmer and all of the other Defendants. It was already well-established in July 2018 that employees and agents of a sheriff had to provide an arrestee, detainee, or inmate who had swallowed a potentially intoxicating substance and was acting erratically with appropriate medical evaluation, treatment, and observation. It was already well-established in July 2018 that employees and agents of a sheriff should not place an inmate or detainee who possibly had taken

enough drugs to overdose in a cell by himself with minimal observation. There were actual policies directly on point that Defendants chose to deliberately ignore or willfully violate. This showed intentional and reckless disregard for Mr. Long's safety that shocks the conscious.

22. Upon information and belief and at all relevant times, Sheriff Palmer, and any and all agents, employees, officers, jailers, deputies, or other persons who worked for him, including all of the named Defendants, waived any potential public official immunity defense. To the extent that Defendants have not expressly waived any public official immunity defense, no such defense can apply. Defendants' overt, grossly negligent violations of Sheriff Palmer's safety policy led directly to and were at least a cause of Mr. Long's death. If they had complied with the safety policy, it would have prevented his unsupervised death. His death was caused by the overt failure to communicate amongst Defendants or by one or more of them deliberately ignoring relevant, safety policy. These actions show that they acted with malice, willfulness, and reckless disregard of his safety. Defendants' conduct was willful and wanton, malicious, and a reckless and egregious disregard of the easily applied policy that would have unquestionably prevented him from dying at the Jail, and it shocks the conscious.

## **JURISDICTION AND VENUE**

23. The allegations in the Paragraphs above are incorporated by reference.

24. All events that form the basis of this Complaint took place in Cherokee County, North Carolina which is in the United States District Court for the Western District of North Carolina.

25.     This Court has original jurisdiction over the subject matter and parties of this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

26.     This Court has supplemental jurisdiction over any state-law based claims in this action pursuant to 28 U.S.C. § 1367.

27.     This Court has venue in this action pursuant to 28 U.S.C. § 1391.

## FACTS

28.     The allegations in the Paragraphs above are incorporated by reference.

29.     On July 11, 2018, Deputy Faggard and Deputy Snyder took a call from dispatch to go to 16 Bear Mountain Estates in Murphy, North Carolina. The call dealt with a man causing a disturbance. While on the way, dispatch advised Deputy Faggard that the man had moved to 825 Tater Creek Road and was in a red Ford Explorer.

30.     After arriving at Tater Creek Road, Deputy Faggard observed Mr. Long walking around without a shirt on, yelling, and cussing. Deputy Faggard saw Mr. Long grab an object like a little tin can, pour it into his mouth, and grab a full cup of water and drink it.

31.     After Mr. Long swallowed, Deputy Faggard placed him in handcuffs and arrested him. Deputy Snyder searched Mr. Long's car.

32.     Deputy Faggard asked Mr. Long if he had swallowed drugs from that container he drank with water. Mr. Long replied "no."  Deputy Faggard asked Mr. Long if he wanted an ambulance to evaluate him. Mr. Long replied "no."

33.     Deputy Faggard searched Mr. Long's pockets and found some money. Deputy Faggard told Mr. Long he would place that money back in Mr. Long's pocket.

34.      Sgt. Williams arrived after the arrest. Deputy Faggard placed Mr. Long in the back of Sgt. William's patrol car.  Deputy Faggard told Sgt. Williams that he saw Mr. Long swallow something, but was unsure what it was. Deputy Faggard was worried that Mr. Long swallowed drugs or some other dangerous substance.

35.      Sgt. Williams asked Mr. Long if he had swallowed drugs. Mr. Long replied "no it was not."  He asked Mr. Long if he wanted an ambulance. Mr. Long replied "no." Sgt. Williams was worried that Mr. Long had swallowed drugs or some other dangerous substance.

36.      Deputy Faggard arrested Mr. Long around 5:45 p.m. Sgt. Williams transported Mr. Long to the Jail around 6:18 p.m. They arrived at the Jail around 7 p.m., and Mr. Long was charged with possession of marijuana, possession of drug paraphernalia, and resist, obstruct, and delay.

37.      Magistrate Bateman held an initial appearance for Mr. Long at about 7 p.m. Sgt. Williams or Deputy Faggard asked Magistrate Bateman  to give Mr. Long a secured bond so he could be held until he sobered because he was obviously intoxicated on some drug or substance. Magistrate Bateman agreed and perceived that Mr. Long was severely impaired. Out of an abundance of caution, Magistrate Bateman set a $1,000.00 secured bond with the expectation that the Jail staff would take care of Mr. Long and get him any medical attention he needed before releasing him.

38.      When Deputy Faggard delivered Mr. Long at the Jail to be booked around 7:07 p.m., he told Sgt. Daly that he had seen Mr. Long swallow something, but that he was

unsure what Mr. Long swallowed. Again, Deputy Faggard was worried that Mr. Long swallowed drugs or some other dangerous substance.

39.     The Sheriff's safety policy for inmates who are processed into the Jail requires that each inmate shall have health appraisal data collected in order to properly classify them, promote awareness of and respond to their medical conditions, and maintain adequate records of their health status. The detention officer who performs the booking process for an arriving inmate must conduct the initial health screening. If the detention officer suspects that an inmate is severely intoxicated on drugs, that detention officer must not admit the inmate to the Jail until the Medical Staff has examined the person and approved his detention at the Jail. If this occurs after hours when the Medical Staff is not present at the Jail, then the arresting officer is supposed to take the inmate to get medically cleared at some other facility separate and apart from the Jail before taking the inmate to the Jail.

40.     The Sheriff's safety policy also requires a preliminary health screening for each newly admitted inmate. The detention officer responsible for booking the inmate must record a general medical and mental health screening. This must occur to determine if an inmate has a condition that is a threat to the health of the facility, staff and inmates, or a threat to the health of the new inmate. The detention officer must interview the inmate concerning the inmate's medical history and current condition. The inmate's answers to the questions and the officer's observations of the inmate's physical condition must be recorded on the Medical and Mental Health Screening form. The completed Medical and Mental Health Screening forms are placed in the Medical Department's box and become

part of the inmate's permanent Jail record. If, after the screening, the officer has reason to suspect that the inmate suffers from any condition which may require further examination, the officer must place the inmate in a specific holding cell, notify the ranking officer on duty, and contact the Medical Department.

41.     The Sheriff's safety policy requires that any newly admitted inmate must be placed in a holding cell during the booking process and receive more frequent observations or surveillance by officers. This means that the officers must observe these inmates at least every 15 minutes and keep a record of each such observation to confirm compliance.

42.     The Sheriff's safety policy requires that if an officer observes an inmate exhibiting signs of emotional instability or psychological distress, the inmate will be placed in administrative segregation (Holding Cell under observation) and the Medical Staff shall be notified in person or by telephone immediately.

43.     The Sheriff's safety policy requires that if a detention officer suspects detoxification, or other medical attention is warranted, the Medical Staff will be called. If the available information indicates an inmate is suffering from severe intoxication, the person shall not be admitted into the Jail until authorization from the Medical Staff is obtained. The following are requirements for detoxification within the Jail: A. Around the clock observation B. Blood pressure and pulse taken periodically C. Eating and sleeping behavior monitored D. Notify Medical Staff if there are: 1. Changes in pulse and blood pressure readings 2. Increased nervousness.

44.     The Sheriff's safety policy requires that mentally or emotionally disturbed inmates, inmates identified as suicide risks, and all inmates housed in disciplinary isolation

shall be observed as often as needed or at least once every fifteen (15) Minutes or as often as needed, to prevent the inmate from harming themselves and that during a surveillance tour (Round), the detention officer shall observe inmates' behavior and appearance for unusual or questionable situations.

45.     The Sheriff's safety policy requires that accurate and complete records must be maintained for all admitted inmates to verify that all applicable state and federal laws, standards, and procedures have been followed.

46.     The Sheriff's policy requires that every inmate who is taken into custody, even those with whom the booking officer is already familiar, must be photographed and, if required by law or order, fingerprinted.

47.     The Sheriff's policy requires that every inmate who is taken into custody, must be at least frisk searched to confiscate any money, belts, shoes, the contents of their pockets, and any other part of the inmate's clothing like keys or watches. The officer who confiscates any such property during a search must list and describe all of it using the inmate property form. For money, the detention officer must count it in the presence of the inmate and place it in a separate envelope with the inmate's full name, the officer's initials, the amount, and then deposit the money in the designated lock box. The officer must obtain the inmate's signature on all of the forms, and if the inmate refuses to sign, then the officer must have another officer sign and attest that the "inmate refused to sign." If an inmate appears to be intoxicated or under the influence of drugs, all personal property of the inmate shall be taken until such time as he can be responsible for his property. In this situation, two officers shall sign the inmate's personal property form.

48.     The Sheriff's policy requires that every inmate who is taken into custody, shall have a reasonable opportunity to contact persons outside the Jail to attempt to secure release, seek legal counsel, and provide notice of incarceration to family or friends. An inmate must be allowed to use the phones near the holding cell while in the booking process before being placed in general population.

49.     The Sheriff's policy requires that every employee sign off on a form that acknowledges: "I understand and agree that I will read and comply with the policies contained in this Manual and any revisions, am bound by the provisions contained therein, and that my continued employment is contingent on following those policies."

50.     Deputy Faggard saw Mr. Long swallow some unknown substance around the time he arrested him. He told Sgt. Williams and Sgt. Daly what he saw. All of the people who came into contact with Mr. Long that evening and night saw that he was acting erratically because he was severely intoxicated. Even Magistrate Bateman knew Mr. Long was severely intoxicated which is why he set a secured bond to keep Mr. Long in Jail until someone responsible could come pick him up. Despite knowing all of this, the detention officers failed to follow the Sheriff's safety policies, and they never even used a special watch or heightened supervision for him. The detention officers did not even ask about the dangerous situation Deputy Faggard told them about when he delivered Mr. Long to be processed pursuant to the Sheriff's safety policy.  They knew about the drugs, but took no action despite what the safety policy required.

51.     At no time during the "intake" process that Sgt. Daly and the other staff at the Jail performed for Mr. Long did anyone alert the medical staff about Mr. Long's

condition. Despite the deputies' and detention officers' knowledge of Mr. Long's severe intoxication, they never took him to a medical provider for evaluation or even called any medical providers to discuss the situation.

52. In the Booking Report form in Mr. Long's Jail records, much of the form is left blank. Sgt. Daly is listed as the booking and searching officer. The time of confinement is listed as 10:30 p.m. Upon information and belief, Mr. Long actually arrived at the Jail after Magistrate Bateman set his bond around 7 p.m. So for some unknown reason, no record exists for what happened to Mr. Long for about 3 and a half hours between 7 to 10:30 p.m. There is no accounting for what happened to Mr. Long in those hours. There were no finger prints taken in this record, or picture taken, even though there are sections to record that information. Also, the release date and time is listed as 11:57 p.m. According to this form, Sgt. Daly released Mr. Long to "Street." Confusingly, Sgt. Daly listed that the incident date and arrest date occurred at midnight on July 12, 2018. So the official Jail record Sgt. Daly created for Mr. Long's incarceration at the Jail states that he was arrested 3 minutes after Sgt. Daly released him to the street. These same times for confinement, arrest, and release appear throughout Mr. Long's Jail records. Neither Mr. Long nor Sgt. Daly signed this form where it should have been signed.

53. In the Jail Prisoner Classification Data form, Sgt. Daly failed to answer any of the questions related to Mr. Long's personal history data related to his medical condition. It is simply blank. Sgt. Daly failed to sign this form, too.

54. In the Personal Information form, Sgt. Daly failed to answer several of the questions related to Mr. Long's personal information such as driver's license number,

phone number, social security number, alias, scars or tattoos, or include a photo. He did state that Mr. Long's booking status was "Released." It is simply blank. Sgt. Daly failed to sign this form, too.

55.     The Medical Observations form is blank. It does not even have Mr. Long's name filled in on it. That appears to show that neither Sgt. Daly nor any other detention officer working at the Jail performed any medical observations on Mr. Long. Sgt. Daly failed to sign this form, too.

56.     The Medical Questionnaire form is blank. It does not even have Mr. Long's name filled in on it. That appears to show that neither Sgt. Daly nor any other detention officer working at the Jail asked any medical questions or made even a cursory evaluation of Mr. Long's condition while he was at the Jail. Sgt. Daly failed to sign this form, too.

57.     The Officer Observations form is blank. It does not even have Mr. Long's name filled in on it. That appears to show that neither Sgt. Daly nor any other detention officer working at the Jail performed any observations on Mr. Long. Sgt. Daly failed to sign this form, too.

58.     The Mental Health Screening form is blank. It does not even have Mr. Long's name filled in on it. That appears to show that neither Sgt. Daly nor any other detention officer working at the Jail performed any screening on Mr. Long to see if he was at risk for suicide. Sgt. Daly failed to sign this form, too.

59.     There is another blank form included by the Sheriff in Mr. Long's Jail records titled the "Temporary Location History" form. This form, like most of the others, is blank. This form is different than the others, though, because it is labeled as "Southern Software

Jail" at the top, instead of "Cherokee County Sheriff's Office" seen on the top of the other forms.

60.     The Medicine To Be Issued- Individual form is blank. It does not even have Mr. Long's name filled in on it.

61.     No evidence exists that any search, neither strip search nor a frisk search nor any other type of search, of Mr. Long ever occurred. There is no fingerprint, no photo, no listing of his personal possessions held for him by the Jail staff, nothing. Upon information and belief, the cash that Deputy Faggard found on Mr. Long at the time of arrest somehow disappeared between that arrest and his release from Jail to be life-flighted to a Tennessee hospital.  It is unclear who took it, but apparently somebody did.

62.     In the Complete Cash Account History form in Mr. Long's Jail records, there is no entry of the money that he allegedly had in his pocket that Deputy Faggard had found during his search at the time of arrest. There is no accounting for what happened to Mr. Long's money that Deputy Faggard claims he left on Mr. Long's person. Upon information and belief, somebody ended up with that money, but not Mr. Long.

63.     In the Initial Custody Assessment Scale form in Mr. Long's Jail records, there is no entry in the "Alcohol and/or Drug Abuse" section.  Jail staff and Deputy Faggard had knowledge of Mr. Long's obvious, severe intoxication, but did not even fill out the Sheriff's form related to his risk factors. Magistrate Bateman relied on his observations of Mr. Long's obvious, severe intoxication to set a $1,000.00 bond to prevent Mr. Long from leaving in such a condition. In the "Special Management Concerns which apply:" section of this form, Sgt. Daly failed to check any of the following conditions for Mr. Long:

"substance abuse," "medical," "psychological impairment," "suicide risk," "mental deficiency," "physical impairment," or "other." Sgt. Daly never filled out or signed anything on this form.

64.     In the Jail Property Inventory and Receipt form in Mr. Long's Jail records, there is no entry that he ever received any Jail issued clothing. There is no evidence that Mr. Long ever changed out of his civilian clothes that he arrived in while at the Jail. Sgt. Daly did not sign this form, but it is dated May 12, 2020.

65.     In the Acknowledgment of Rights form in Mr. Long's Jail records, there is no entry on the form. It is blank, other than the date of May 12, 2020. There is no evidence that Mr. Long ever received any notice of his rights. Sgt. Daly did not sign this form, either.

66.     In the Inmate Mugshot and SMT Picture History form in Mr. Long's Jail records, there is no entry on the form. It is blank. There is no evidence that Sgt. Daly ever took a picture or mugshot of Mr. Long during his time at the Jail.

67.     In the Inmate Statuses form in Mr. Long's Jail records, there is no entry on the form. It appears to be blank except there is an entry next to "Status" that reads: "Deleted?" Upon information and belief, this may be some evidence that Mr. Long's Jail record was tampered with such that his original record was destroyed and replaced with this overwhelmingly blank set of forms.

68.     In the Inmate Watch Log form in Mr. Long's Jail records, there is no entry on the form about who established any special watch or ended it. It is blank, other than the inclusion of a few items to identify Mr. Long like his name and date of birth. There is no

evidence that Sgt. Daly or the other detention officers at the Jail performed any watches on Mr. Long.

69.     In the Inmate Data form in Mr. Long's Jail records, Sgt. Daly did not check off the following boxes on this form, with either a "yes" or "no" response: "fingerprinted," "picture taken," "DNA done," "meds," or "Assaultive." It appears that Sgt. Daly did not do anything related to a normal booking of an inmate when he filled out this form at 10:30 p.m. on July 11, 2018. He did not sign or fill anything out on this form related to Mr. Long being released, either.

70.     The conspicuous lack of documentation and delay from the time Mr. Long arrived to when he was allegedly booked at the Jail, upon information and belief, suggests that his Jail records may have been tampered with either in the late evening of July 11, 2018, or after he was taken to the hospital and died. If that happened, it would be an illegal cover-up meant to hide the truth of what Mr. Long actually suffered while in the Sheriff's custody and control that night.

71.     The detention officers placed Mr. Long in holding cell 127A which was located near the booking area.

72.     Upon information and belief, detention officers made sporadic observation rounds past Mr. Long's cell. Upon information and belief, at approximately 10:49 p.m., video of the outside door of holding cell 127A showed Mr. Long pushed a folded piece of paper through the door of his cell. It is unclear how Mr. Long had anything in his possession at that time to push through the door. It is also unclear what was on that piece of paper because, upon information and belief and in defiance of all common sense and law

enforcement tactics, nobody from the Sheriff's Department ever collected that piece of evidence from the scene. Or at least, that piece of evidence was apparently not collected and stored such that it is in their possession now. It is entirely possible that someone from the Sheriff's Department looked at the piece of paper and destroyed it after seeing what was written on it.

73.     Around 11:01 p.m., Officer Bolen conducted a circuit of observations in the Jail. Officer Bolen allegedly walked past Mr. Long's cell and used an electronic detection wand on the sensor there at approximately 11:12 p.m. Officer Bolen claims that 2 minutes later, at 11:14 p.m., he looked in the cell and saw Mr. Long laying on his back, not moving. Officer Bolen claims that he kicked the cell door and yelled at Mr. Long. Officer Bolen claims that Mr. Long did not respond, so Officer Bolen went to the booking desk to retrieve the key.

74.     According to the records at the Jail, Officer Holloway used an electronic detection wand on the sensor outside of Mr. Long's cell at approximately 11:12 p.m. That was the only sensor that Officer Holloway touched with a wand during the 11 o'clock hour that night at the Jail. He allegedly touched that sensor around the same time that Officer Bolen did, and about 2 minutes before Officer Bolen claims to have noticed Mr. Long laying on the ground, not moving. So, upon information and belief, somehow they both made an independent observation of Mr. Long at 11:12 p.m. and then, for some reason Officer Bolen went back and checked the cell again 2 minutes later. Only then did Officer Bolen see Mr. Long on the floor.

75.     Officer Enloe entered an entry on the shift log at 11:01 p.m. that stated, "Cell Check, Detention Area, Rounds made by Bolen all secure."  Officer Enloe did not make any entry about Officer Holloway doing any rounds at 11:12 p.m.

76.     At 11:14:33 p.m., Officer Bolen opened Mr. Long's cell door. When he entered the cell, Officer Bolen claimed he noticed that Mr. Long was not breathing and his eyes were wide open. At that point, Officer Bolen said he yelled for Sgt. Daly and Officer Holloway to come quickly. It is unclear how Officer Holloway had managed to leave the area in the 2 minutes or so since he had touched the sensor with his wand. Officer Bolen did not detect a pulse when he checked Mr. Long's wrist. When Sgt. Daly arrived, Officer Bolen told him what was happening. Officer Bolen then directed Officer Enloe, who was acting as the tower operator, to activate the EMS system.

77.     Officer Enloe entered an entry on the shift log at 11:15 p.m. that stated, "Officer Bolen and Sgt. Daly call for 911 for an unresponsive inmate in holding cell 127, 911 called by tower." Officer Enloe called 911 and an ambulance was sent to the Jail.

78.     Officer Holloway began to attempt CPR on Mr. Long while Officer Bolen went to medical to retrieve Narcan. Narcan is a drug that is given to a patient who is overdosing on an opioid to treat that type of overdose. After Officer Holloway brought the Narcan to the cell, Sgt. Daly administered Narcan to Mr. Long. Narcan does not help with a patient who has used methamphetamines. But, this showed that all of the detention officers at the Jail that night knew that Mr. Long was severely intoxicated and at risk for some medical problems as a result of whatever unknown substance he swallowed at the

time of his arrest. They just did not know what intoxicating substance Mr. Long had used, and made no efforts to bother to find out.

79.     At about 11:19 p.m., while Officer Enloe spoke on the radio with the EMS dispatchers, a male officer stated over the radio that Mr. Long "might be coming down off of something." Again, this showed that the detention officers knew Mr. Long was severely intoxicated and at risk for some medical problems as a result of whatever unknown substance he swallowed at the time of his arrest.

80.     While they should have focused their attention on transferring Mr. Long to receive appropriate medical care as quickly as possible, upon information and belief, the detention officers or upper management of the Jail and Sheriff's Department began frantically trying to convert Mr. Long's $1,000.00 secured bond set by Magistrate Bateman to an unsecure bond as he lay dying.

81.     Upon information and belief, after realizing that Mr. Long suffered from some serious medical issues and needed CPR in the Jail, the senior management at the Jail and Sheriff's Department tried to convert Mr. Long's bond from secured to unsecured in an effort (entirely misguided and illegal) to "release" him from custody in an attempt to avoid paying for his medical treatment.

82.     Around midnight of July 12, someone from the Sheriff's Department asked Magistrate Bateman to convert Mr. Long's bond from secured to unsecured, but Magistrate Bateman refused to sign off on that without some permission or approval from the District Attorney's office.

83. Upon information and belief, at approximately 12:26 a.m. on July 12, at the request of the Sheriff's Department, an Assistant District Attorney authorized converting Mr. Long's secured bond to an unsecured bond. Upon information and belief, at about 12:30 a.m., Magistrate Bateman signed an appearance bond for pretrial release and a conditions of release and release order for Mr. Long without any secured bond. Upon information and belief, someone from the Sheriff's Department signed that appearance bond with Mr. Long's name because Mr. Long could not sign it as he lay unconscious, dead or dying, while waiting to leave to go to the hospital.

84. Upon information and belief, only after the Sheriff's Department had Mr. Long's bond converted from secured to unsecured did the medevac helicopter depart at approximately 12:40 a.m. Upon information and belief, the bond issue delayed his departure by 30-45 minutes due to the bond issue. The helicopter departed Cherokee County for Erlanger Medical Center in Chattanooga. When it arrived, Mr. Long was pronounced dead at 1:21 a.m. on July 12, 2018. The EMS personnel had noted Mr. Long had a strong pulse at 11:59 p.m. on July 11, 2018.

85. The autopsy results showed that Mr. Long died of methamphetamine overdose. If he had received proper and timely medical evaluation and treatment, this condition was treatable, and his death was avoidable.

86. As a direct result of the Sheriff and his employees failing to comply with the safety policies, common sense, and community standards, Mr. Long suffered a terrifying, preventable, and totally unnecessary death.

87. Defendants' actions, individually and combined, directly led to and caused Mr. Long's suffering and death.

88. Defendants' actions violated Mr. Long's clearly established and well-settled fundamental rights under the United States Constitution, including the right to be free from cruel or unusual punishment, the right to adequate, necessary, and emergency medical care while in custody, the right to due process before being deprived of his life, the right to substantive due process under the Fourteenth Amendment, and other inalienable rights retained by him as a citizen regardless of his circumstances in custody.

## CAUSES OF ACTION

### COUNT ONE: VIOLATIONS OF FEDERAL CIVIL RIGHTS LAWS 42 U.S.C. § 1983 and 1988 --- CHEROKEE COUNTY, CHEROKEE COUNTY SHERIFF'S DEPARTMENT, SHERIFF PALMER, CHIEF DEPUTY THIGPEN, CAPT. PATTERSON, LT. BRESCH, SGT. WILLIAMS, and SGT. DALY. (in their official and individual capacities)

89. The allegations in the Paragraphs above are incorporated by reference.

90. At all relevant times, Sheriff Palmer, Chief Deputy Thigpen, Capt. Peterson, Lt. Bresch, Sgt. Williams, and Sgt. Daly were responsible for the formulation and execution of policies regarding the custody, care, and safekeeping of inmates and detainees at the Jail.

91. At all relevant times, Sheriff Palmer, Chief Deputy Thigpen, Capt. Peterson, Lt. Bresch, and Sgt. Daly were responsible for the formulation and execution of policies regarding the level of care and supervision provided to inmates and detainees at the Jail.

92. Sheriff Palmer was elected Sheriff of Cherokee County in 2014 and again in 2018. He was the Sheriff of Cherokee County in July 2018 and continues to serve in that capacity.

93. Sheriff Palmer was and is the Sheriff of Cherokee County and has oversight over all Cherokee County Sheriff Department programs and departments.

94. Sheriff Palmer was the final policymaker for the Cherokee County Sheriff's Department.

95. Pursuant to N.C. Gen. Stat. § 162-13 *et.seq.*, Sheriff Palmer, as the Sheriff of Cherokee County, is the final policymaker for all policies and procedures established to govern the operations and activities of the Jail.

96. These named Defendants are "persons" as defined pursuant to 42 U.S.C. § 1983 and <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 98 S. Ct. 2018 (1978), and its progeny.

97. Defendant Sheriff Palmer, as Sheriff of Cherokee County, established as official policy or de facto practice or custom lackadaisical, irresponsible, dangerous, and reckless behavior by the deputies, officers, and other employees and staff at the Jail. While he had a written safety policy to handle impaired or intoxicated inmates, Defendants failed to adhere to the Sheriff's safety policy.

98. The Cherokee County Sheriff's Department, through Sheriff Palmer on down to the administrator of the Jail and other supervisors, maintained a policy, custom, or pattern and practice of promoting, facilitating, and condoning the improper, illegal, and

unconstitutional techniques by the deputies and detention officers at the Jail. Their acts and omissions leading to Mr. Long's death shock the conscious.

99. The Cherokee County Sheriff's Department, through Sheriff Palmer, further demonstrated deliberate indifference to the unlawful, and unconscionable actions of his deputies, officers, employees, and staff, and further failed to adequately train, supervise, monitor, enforce, or discipline Defendants, as set forth above, in connection with complying with the written safety policy to protect and ensure Mr. Long's constitutional rights were not violated.

100. Because the Cherokee County Sheriff's Department or Sheriff Palmer was the final policy maker in July 2018, their acts or omission during that time constituted the policy, custom, or pattern and practice of Cherokee County and the Cherokee County Sheriff's Department.

101. These failures to train and use of illegal and unconstitutional practices and customs that diverge from any written policy amounted to deliberate indifference to the rights of persons with whom the Sheriff and his employees and agents came into contact. The Sheriff's failure to train, and instead allowing and condoning the use of illegal and unconstitutional practices and customs that diverge from any written policy, reflected a deliberate or consciously indifferent "policy," that these failures can fairly be said to be the moving force behind the constitutional violation and are closely related to the harm and injury Mr. Long suffered, meaning it is at least a cause of the injuries and harm he suffered.

102. Upon information and belief and at all relevant times, Sheriff Palmer, Chief Deputy Thigpen, Capt. Peterson, Lt. Bresch, Sgt. Williams, and Sgt. Daly were acting

under color of state law, had in effect de facto policies, practices, and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of the officers who worked at the Jail, as alleged above, including, *inter alia*:

a. The failure to draft or institute constitutionally adequate policies or procedures necessary to ensure that inmates and detainees were provided appropriate, necessary, and adequate medical care and screening for and evaluating drug use, intoxication, and overdoses in inmates and detainees;

b. The failure to adequately train, supervise, instruct, or monitor deputies and detention officers in the proper methods, practices, or policies for screening for and evaluating drug use, intoxication, and overdoses in inmates and detainees;

c. The failure to adequately train, supervise, instruct, or monitor deputies and detention officers in the proper methods, practices, or policies for providing safe care and requesting medical evaluation or treatment with drug use, intoxication, and overdoses in inmates and detainees;

d. The failure to draft or institute constitutionally adequate policies or procedures necessary to ensure that inmates and detainees were provided appropriate, necessary, and adequate medical care and screening for and evaluating inmates and detainees with serious medical conditions;

e. The failure to adequately train, supervise, instruct, or monitor deputies and detention officers in the proper methods, practices, or policies for screening for and evaluating inmates and detainees with serious medical conditions;

f. The failure to adequately train, supervise, instruct, or monitor deputies and detention officers in the proper methods, practices, or policies for providing safe care and requesting medical evaluation or treatment for inmates and detainees with serious medical conditions;

g. The failure to draft or institute constitutionally adequate policies or procedures necessary to ensure that inmates and detainees were provided appropriate, necessary, and adequate

medical care and screening for initial health screening and evaluating inmates and detainees arriving at the Jail;

h.     The failure to adequately train, supervise, instruct, or monitor deputies and detention officers in the proper methods, practices, or policies for initial health screening and evaluating inmates and detainees arriving at the Jail;

i.      The failure to adequately train, supervise, instruct, or monitor deputies and detention officers in the proper methods, practices, or policies for providing safe care and requesting medical evaluation or treatment for initial health screening and evaluating inmates and detainees arriving at the Jail;

j.      The failure to ensure deputies and detention officers were trained on and familiar with, and actually complied with the Cherokee County Sheriff Standard Operating Guidelines related to the proper methods, practices, or policies for providing safe care and treatment to inmates and detainees at the Jail;

k.     The failure to ensure deputies and detention officers complied with the Cherokee County Sheriff Standard Operating Guidelines related to the proper methods, practices, or policies for providing safe care and treatment to inmates and detainees at the Jail and instead allowing them to engage in practices that conflict with and disregard those Standard Operating Guidelines;

l.      The failure to ensure deputies and detention officers complied with applicable statutes and administrative code rules;

m.     The failure to ensure that deputies and detention officers were not assigned other duties that would interfere with the appropriate supervision, evaluation, processing, custody, or control of inmates and detainees; and

n.     Other violations of policies, customs, rules, laws, the Constitution, and practices to be identified during the course of discovery or trial.

103.    Upon information and belief, Sheriff Palmer, Chief Deputy Thigpen, Capt. Peterson, Lt. Bresch, Sgt. Williams, and Sgt. Daly had actual or constructive knowledge that the deputies, detention officers, supervisors, agents, or employees who worked at the Jail were, and had been before and after July 2018, engaged in conduct in direct conflict with the Sheriff's safety policy and the applicable laws and rules that posed a pervasive and unreasonable risk of constitutional injury to inmates and detainees, such as Mr. Long.

104.    Upon information and belief, the response of Sheriff Palmer, Chief Deputy Thigpen, Capt. Peterson, Lt. Bresch, Sgt. Williams, and Sgt. Daly to such actual or constructive knowledge, even after repeated instances of injury or death to other inmates and detainees, was so inadequate as to show deliberate indifference to or tacit authorization of the offensive practices described herein. In fact, by their conduct, these Defendants created and encouraged a culture of neglect and indifference towards inmates and detainees in the Jail that shocked the conscious.

105.    As a direct and proximate result of the violations of these policies, practices, and customs, these Defendants violated Mr. Long's rights under the United States Constitution, including rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments, and under other federal laws.

106.    The right to reasonable medical evaluation, treatment, and care is a clearly established constitutional right, pursuant to the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and is a right about which any reasonable sheriff, officer, deputy, supervisor, agent, or employee in the position of each of these Defendants would and should have known. It is not possible, given the normal expectations

of jailers and law enforcement officers in general, that these Defendants can claim that they were unaware of what should have happened to avoid violating Mr. Long's constitutionally protected rights in this situation. Indeed, if they had merely ensured that the officers and deputies knew of and complied with the Sheriff's safety policy, Mr. Long would not have been ignored until he died. As a result, the defense of qualified immunity is unavailable to, and has been waived by, these Defendants.

107.    As a direct and proximate result of the deprivation of Mr. Long's constitutional and federal rights as alleged herein, he died a painful, terrifying, preventable, and totally unnecessary death while in the custody of the Sheriff at the Jail and totally unable to fend for himself.  Consequently, Mr. Long's Estate is entitled to recover from each of these Defendants, in their individual capacities and official capacities, compensatory damages in an amount in excess of $25,000.00.

108.    Furthermore, Mr. Long's Estate is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each of these Defendants, in their individual capacities, to punish these defendants for their illegal, unconstitutional, egregiously wrongful, reckless and willful misconduct and to deter others from engaging in similar conduct in the future.

**COUNT TWO: VIOLATIONS OF FEDERAL CIVIL RIGHTS LAWS 42 U.S.C. § 1983 and 1988 --- SGT. WILLIAMS, DEPUTY FAGGARD, SGT. DALY, OFFICER BOLEN, OFFICER HOLLOWAY, and OFFICER ENLOE.**
**(in their official and individual capacities)**

109.    The allegations in the Paragraphs above are incorporated by reference.

110. At all relevant times, Sgt. Williams, Deputy Faggard, Sgt. Daly, Officer Bolen, Officer Holloway, and Officer Enloe were responsible for the execution of and compliance with the Sheriff's safety policy regarding the care, custody, and safekeeping of inmates and detainees at the Jail.

111. Upon information and belief and at all relevant times Sgt. Williams, Deputy Faggard, Sgt. Daly, Officer Bolen, Officer Holloway, and Officer Enloe were acting under color of state law, and had in effect de facto policies, practices, and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of the officers or deputies, as alleged above, including, *inter alia*:

  a. The failure to adequately train on and understand the proper methods, practices, or policies for screening for and evaluating drug use, intoxication, and overdoses in inmates and detainees;

  b. The failure to comply with the proper methods, practices, or policies for providing safe care and requesting medical evaluation or treatment with drug use, intoxication, and overdoses in inmates and detainees;

  c. The failure to adequately train on and understand the proper methods, practices, or policies for screening for and evaluating inmates and detainees with serious medical conditions;

  d. The failure to comply with the proper methods, practices, or policies for providing safe care and requesting medical evaluation or treatment for inmates and detainees with serious medical conditions;

  e. The failure to adequately train on and understand the proper methods, practices, or policies for initial health screening and evaluating inmates and detainees arriving at the Jail;

  f. The failure to comply with the proper methods, practices, or policies for providing safe care and requesting medical evaluation or treatment for initial health screening and evaluating inmates and detainees arriving at the Jail;

g.   The failure to adequately train on and understand, and actually comply with, the Cherokee County Sheriff Standard Operating Guidelines related to the proper methods, practices, or policies for providing safe care and treatment to inmates and detainees at the Jail;

h.   Engaging in practices that conflict with and disregard the Sheriff's Standard Operating Guidelines;

i.   The utter and complete failure to document any relevant information with Mr. Long during the intake and booking process and instead ignoring him and his serious condition in direct and flagrant violation of the Sheriff's safety policy until died an entirely preventable death;

j.   The failure to comply with applicable statutes and administrative code rules;

k.   The failure to ensure that they were not assigned to other duties that would interfere with the appropriate supervision, evaluation, processing, custody, or control of inmates and detainees, including Mr. Long; and

l.   Other violations of policies, customs, rules, laws, the Constitution, and practices to be identified during the course of discovery or trial.

112.   Upon information and belief, Sgt. Williams, Deputy Faggard, Sgt. Daly, Officer Bolen, Officer Holloway, and Officer Enloe had actual or constructive knowledge that on July 11, 2018, the deputies, detention officers, supervisors, agents, or employees engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to inmates and detainees, including Mr. Long, and had been doing so prior to July 2018.

113.   Upon information and belief, the response of Sgt. Williams, Deputy Faggard, Sgt. Daly, Officer Bolen, Officer Holloway, and Officer Enloe to such actual or constructive knowledge, even after repeated instances of injury or death to other inmates

and detainees, was so inadequate as to show deliberate indifference to or tacit authorization of the offensive practices described herein. In fact, by their conduct, these Defendants created and encouraged a culture of neglect and indifference towards inmates and detainees in the Jail.

114. As a direct and proximate result of the violations of these policies, practices, and customs, these Defendants violated Mr. Long's rights under the United States Constitution, including rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments, and under other federal laws.

115. The right to reasonable medical evaluation, treatment, and care is a clearly established constitutional right, pursuant to the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and is a right about which any reasonable sheriff, officer, deputy, supervisor, agent, or employee in the position of each of these Defendants would and should have known. It is not possible, given the normal expectations of jailers and law enforcement officers in general, that these Defendants can claim that they were unaware of what should have happened to avoid violating Mr. Long's constitutionally protected rights in this situation. Indeed, if they had merely knew of and complied with the Sheriff's safety policy, Mr. Long would not have been ignored until he died. As a result, the defense of qualified immunity is unavailable to, and has been waived by, these Defendants.

116. As a direct and proximate result of the deprivation of Mr. Long's constitutional and federal rights as alleged herein, he died a painful, terrifying, preventable, and totally unnecessary death while in the custody of the Sheriff at the Jail and totally

unable to fend for himself. Consequently, Mr. Long's Estate is entitled to recover from each of these Defendants, in their individual capacities and official capacities, compensatory damages in an amount in excess of $25,000.00.

117.    Furthermore, Mr. Long's Estate is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each of these Defendants, in their individual capacities, to punish these defendants for their illegal, unconstitutional, egregiously wrongful, reckless and willful misconduct and to deter others from engaging in similar conduct in the future.

## COUNT THREE WRONGFUL DEATH — SHERIFF PALMER, CHIEF DEPUTY THIGPEN, CAPT. PATTERSON, LT. BRESCH, SGT. WILLIAMS, SGT. DALY, DEPUTY FAGGARD, OFFICER BOLEN, OFFICER HOLLOWAY, and DETENTION ENLOE
### (In their individual and official capacities)

118.    The allegations in the Paragraphs above are incorporated by reference.

119.    These Defendants owed the following duties to Mr. Long and every other inmate or detainee at the Jail:

        a.    To ensure that detention officers and other agents and employees assigned to work at the Jail perform their duties in such a way as to avoid placing Mr. Long in unnecessary or avoidable danger of injury or death;

        b.    To ensure that detention officers and other agents and employees assigned to work at the Jail are present and available to provide appropriate supervision of Mr. Long so that he would be secure and protected from foreseeable danger of injury or death while in custody;

        c.    To ensure that detention officers and other agents and employees assigned to work at the Jail supervised and observed Mr. Long sufficiently to maintain safe custody and control of him while avoiding foreseeable danger of injury or death;

d. To ensure that detention officers and other agents and employees assigned to work at the Jail were, at all times, appropriately informed of the Sheriff's safety policy and complied with it in their interactions with Mr. Long;

e. To ensure that detention officers and other agents and employees assigned to work at the Jail were, at all times, appropriately informed of Mr. Long's general health and any emergency or dangerous medical issues; and

f. To ensure that routine and emergency medical care and health screening was provided to Mr. Long while he was incarcerated in the custody of the Sheriff at the Jail.

120. These Defendants breached these duties, including but not limited to, *inter alia*:

a. The failure to adequately train, supervise, instruct, or monitor officers or deputies in the proper method, practices, or policies for screening for and evaluating drug use, intoxication, and overdoses in inmates and detainees;

b. The failure to ensure officers or deputies complied with the proper methods, practices, or policies for providing safe care and requesting medical evaluation or treatment with drug use, intoxication, and overdoses in inmates and detainees;

c. The failure to adequately train, supervise, instruct, or monitor officers or deputies in the proper methods, practices, or policies for screening for and evaluating inmates and detainees with serious medical conditions;

d. The failure to ensure officers or deputies complied with the proper methods, practices, or policies for providing safe care and requesting medical evaluation or treatment for inmates and detainees with serious medical conditions;

e. The failure to adequately train, supervise, instruct, or monitor officers or deputies in the proper methods, practices, or policies for initial health screening and evaluating inmates and detainees arriving at the Jail;

f.   The failure to ensure officers or deputies complied with the proper methods, practices, or policies for providing safe care and requesting medical evaluation or treatment for initial health screening and evaluating inmates and detainees arriving at the Jail;

g.   The failure to adequately train, supervise, instruct, or monitor officers or deputies in the proper methods, practices, or policies for understanding with the Cherokee County Sheriff Standard Operating Guidelines related to the proper methods, practices, or policies for providing safe care and treatment to inmates and detainees at the Jail;

h.   The failure to adequately train, supervise, instruct, or monitor officers or deputies in the proper methods, practices, or policies for complying with the Cherokee County Sheriff Standard Operating Guidelines related to the proper methods, practices, or policies for providing safe care and treatment to inmates and detainees at the Jail;

i.   The failure to adequately train, supervise, instruct, or monitor officers or deputies to avoid or correct them when they engaged in practices that conflict with and disregard the Sheriff's Standard Operating Guidelines;

j.   The failure to adequately train, supervise, instruct, or monitor officers or deputies to avoid violating or correct them when they engaged in practices that conflict with applicable statutes and administrative code rules;

k.   The failure to properly supervise officers or deputies responsible for the health and safety of Mr. Long and all other inmates and detainees at the Jail;

l.   The failure to properly supervise and protect Mr. Long and all other inmates and detainees at the Jail to ensure their safety and avoid preventable injury and death;

m.   The failure to draft or institute proper policies or procedures necessary to see that inmates and detainees were provided appropriate, necessary and adequate medical care, and protection from emergency and perilous medical conditions;

n.      The failure to enforce and follow any policies or procedures that existed to ensure and protect the safety of the inmates and detainees in the custody of the Sheriff at the Jail;

o.      The failure to prevent officers or deputies from engaging in practices and customs that conflicted with and disregarded the Sheriff's Standard Operating Guidelines which were meant to protect and ensure the safety of Mr. Long and the inmates and detainees in the custody of the Sheriff at the Jail;

p.      The failure to adequately train on and understand the proper methods, practices, or policies for screening for and evaluating drug use, intoxication, and overdoses in inmates and detainees;

q.      The failure to comply with the proper methods, practices, or policies for providing safe care and requesting medical evaluation or treatment with drug use, intoxication, and overdoses in inmates and detainees;

r.      The failure to adequately train on and understand the proper methods, practices, or policies for screening for and evaluating inmates and detainees with serious medical conditions;

s.      The failure to comply with the proper methods, practices, or policies for providing safe care and requesting medical evaluation or treatment for inmates and detainees with serious medical conditions;

t.      The failure to adequately train on and understand the proper methods, practices, or policies for initial health screening and evaluating inmates and detainees arriving at the Jail;

u.      The failure to comply with the proper methods, practices, or policies for providing safe care and requesting medical evaluation or treatment for initial health screening and evaluating inmates and detainees arriving at the Jail;

v.      The failure to adequately train on and understand, and actually comply with, the Cherokee County Sheriff Standard Operating Guidelines related to the proper methods, practices, or policies for providing safe care and treatment to inmates and detainees at the Jail;

w.   Engaging in practices that conflict with and disregard the Sheriff's Standard Operating Guidelines;

x.   The failure to comply with applicable statutes and administrative code rules;

y.   Ignoring Mr. Long completely and not even bothering to complete most of the intake booking paperwork and instead sticking him in a cell in an overtly intoxicated and dangerous condition until he died;

z.   The failure to ensure that they were not assigned to other duties that would interfere with the appropriate supervision, evaluation, processing, custody, or control of inmates and detainees, including Mr. Long; and

aa.   In other ways to be identified during the course of discovery or trial.

121.   At the time that the other Defendants committed the negligent, grossly negligent, willful and wanton, and reckless acts and omissions described above, they were acting within the course and scope of their employment or agency with Sheriff Palmer, as the Sheriff of Cherokee County. As such, Sheriff Palmer is liable for the conduct of the other Defendants and such conduct is imputed to Sheriff Palmer through the doctrines of agency, vicarious liability, and *respondeat superior*.

122.   As a direct and proximate result of the negligent, grossly negligent, willful and wanton, and reckless acts and omissions of these Defendants described above, Mr. Long died a painful, terrifying, totally preventable, and unnecessary death. Consequently, Mr. Long's estate is entitled to recover compensatory damages in an amount in excess of $25,000.00 from each of the following Defendants: Sheriff Palmer, Capt. Patterson, Lt. Bresch, and Sgt. Daly in their individual and official capacity.

123.     Furthermore, Mr. Long's estate is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish these Defendants for the illegal, egregiously wrongful, reckless and willful misconduct committed by each of them individually and their agents, subordinates, and employees so as to deter others from engaging in similar conduct in the future.

**COUNT FOUR: VIOLATION OF N.C. GEN. STAT. § 162-55--- SHERIFF PALMER, CHIEF DEPUTY THIGPEN, CAPT. PATTERSON, LT. BRESCH, SGT. DALY, OFFICER BOLEN, OFFICER HOLLOWAY,  AND OFFICER ENLOE.**
**(In their individual and official capacities)**

124.     The allegations in the Paragraphs above are incorporated by reference.

125.     Sheriff Palmer, Chief Deputy Thigpen,  Capt. Patterson, Lt. Bresch, Sgt. Daly, Officer Bolen, Officer Holloway, and Officer Enloe were keepers of the Jail pursuant to N.C. Gen. Stat. § 162-55 while Mr. Long was in custody at the Jail on July 11, 2018.

126.     As alleged above, the conduct of these Defendants as it related to Mr. Long with regard to the lack of attention, failure to comply with the Sheriff's safety policy, utter disregard of it in favor of unwritten practices and customs, and overt indifference to Mr. Long's condition was negligent and grossly negligent. But it was worse than just that: these Defendants' acts were so careless, wanton, and reckless that it demonstrated a thoughtless disregard of the consequences and a heedless indifference to Mr. Long's safety, rights, and even his life.

127.     These Defendants' acts, omissions, and conduct, as alleged above, were at least a proximate cause of Mr. Long's death and constitute a wrong or injury to him pursuant to N.C. Gen. Stat. § 162.55.

128.     Sheriff Palmer, Chief Deputy Thigpen, Capt. Patterson, Lt. Bresch, and Sgt. Daly are liable for the conduct of the subordinate detention officers and staff who worked at the Jail on July 11, 2018, in their supervisory capacity. As such, all of the conduct described above is imputed to Sheriff Palmer. All of the conduct as described above, other than Sheriff Palmer's, is imputed to Chief Deputy Thigpen.  All of the conduct as described above, other than Sheriff Palmer's or Chief Deputy Thigpen's, is imputed to Capt. Patterson. All of the conduct as described above, other than Sheriff Palmer's, Chief Deputy Thigpen's, or Capt. Patterson's, is imputed to Lt. Bresch. All of the conduct as described above, other than Sheriff Palmer's, Chief Deputy Thigpen's, Capt. Patterson's, or Lt. Bresch's, is imputed to Sgt. Daly. This occurs by way of the doctrines of agency, vicarious liability, and *respondeat superior*.

129.     As a direct and proximate result of the conduct of these Defendants, as alleged above, Mr. Long died a painful, terrifying, preventable, totally unnecessary death in the Jail. Consequently, Mr. Long's estate is entitled to recover from each of these Defendants, in their individual and official capacities, compensatory damages in an amount in excess of $25,000.00 pursuant to N.C. Gen. Stat. § 162-55.

130.     Furthermore, Mr. Long's estate is entitled to recover treble damages as set out in N.C. Gen. Stat. § 162-55.

## COUNT FIVE: ACTION ON BONDS and N.C. GEN. STAT. § 58-76-1, *et sequ*. — OHIO CASUALTY SURETY

131.     The allegations in the Paragraphs above are incorporated by reference.

132.    As alleged herein, Sheriff Palmer neglected the duties of his office and committed negligence, gross negligence, and wrongful acts as Sheriff of Cherokee County. The other individual Defendants committed negligence, gross negligence, and wrongful acts as employees, agents, or on behalf of the Sheriff of Cherokee County.

133.    Mr. Long died as a proximate result of Defendants' neglect, negligence, gross negligence, and wrongful acts in the scope of their employment by the Sheriff's Department. Consequently, Mr. Long's estate is entitled to recover damages in excess of $25,000.00 from the Surety.

## DAMAGES

134.    The allegations in the Paragraphs above are incorporated by reference.

135.    At the time of his death, Mr. Long had a child and an expectation of living out the rest of his life for many decades. Defendants' actions deprived Mr. Long and his young daughter from having an opportunity to fulfill these humble wishes and destroyed these familial bonds.

136.    As a direct and proximate result of these wrongful and negligent actions by Defendants, Mr. Long suffered loss and is entitled to recover from Defendants, jointly and severally, under both the North Carolina Wrongful Death Statute N.C. Gen. Stat. § 28A-18-2, N.C. Gen. Stat. 162-55, and 42 U.S.C. § 1983: compensation for the totally avoidable and unnecessary pain and suffering Mr. Long experienced leading up to his death on July11, 2018; funeral expenses incurred for his burial; the value of services, protection, care and assistance of Mr. Long to his young daughter; and any other damages or expenses

incurred by Mr. Long or his estate resulting from the wrongful, grossly negligent, and negligent actions by Defendants that led to his preventable death.

137. Mr. Long's young daughter is entitled to loss of consortium that she would have received from Mr. Long to include his society, companionship, comfort, guidance, kindly offices and advice.

138. Mr. Long's estate is also entitled to recover from Defendants, jointly and severally, treble damages pursuant to N.C. Gen. Stat. § 162-55 due to their gross negligence.

139. By reason of the grossly negligent, reckless, malicious, needless, willful and wanton conduct of Defendants, as alleged above, as well as Defendants' conscious disregard for the safety of Mr. Long, Mr. Long's estate is entitled to receive punitive damages under both the state and federal law in an amount to be determined at trial to punish Defendants' for their unconstitutional, egregious, reckless, willful and wanton misconduct and to deter such conduct by others in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Long's estate, respectfully prays this Honorable Court that he have and recover judgment against Defendants, jointly and severally, in their individual and official capacities, as follows:

1. Compensatory damages in an amount in excess of twenty-five thousand dollars ($25,000);

2. Treble damages pursuant to N.C. Gen. Stat. § 162-55;

3.      Punitive damages in accordance with the law in an amount to be determined by a Jury;

4.      That the costs of this action, including but not limited to, pre-judgment and post-judgment interest charged at the legal rate and attorneys' fees pursuant to 42 U.S.C. § 1988 and as otherwise allowed by law be assessed against Defendants from the time of the filing of this action until paid;

5.      For Jury trial on all issues of fact; and

6.      For any and all further relief as to the Court may seem just and proper.

This 17th day of June, 2020.

s/ W. Ellis Boyle
W. Ellis Boyle
N.C. State Bar No. 33826
*Attorney for Plaintiff*
Knott & Boyle, PLLC
4800 Six Forks Road, Suite 100
Raleigh, NC  27609
Telephone:  919-783-5900
Facsimile:  919-783-9650
Email:  ellis@knottboyle.com

s/ E. Winslow Taylor
E. Winslow Taylor
N.C. State Bar No. 45533
*Attorney for Plaintiff*
Taylor & Taylor Attorneys at Law PLLC
486 Patterson Ave., Suite 208
Winston-Salem, NC 27101
Telephone: 336-391-7990
Facsimile:  336-418-4745
Email: winslow@t2legal.com